File Name: 05a0457n.06
Filed:  June 1, 2005

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

Nos. 03-5567; 03-5701; 03-6376

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**UNITED STATES OF AMERICA,**
    **Plaintiff-Appellee,**

                                                    **On Appeal from the United States District Court**
**v.**                                              **for the Eastern District of Tennessee**

**ABEL SANTIAGO; RUEBEN**
**SANTIAGO; HILARIO ZUNIGA,**
    **Defendants-Appellants.**

---

**Before:**      **SUTTON** and **COOK**, Circuit Judges; **ALDRICH**, District Judge[*]

---

        ANN ALDRICH, District Judge.    In these criminal appeals, three men challenge their

convictions on various charges of narcotics distribution and criminal conspiracy.

        A jury in the Eastern District of Tennessee convicted Rueben Santiago of conspiracy to distribute

over 1,000 kilograms of marijuana, conspiracy to distribute over five kilograms of cocaine, use of a

communication device to facilitate the distribution of a controlled substance, and distribution of a

quantity of cocaine. Rueben Santiago was sentenced to 210 months' imprisonment.

        The same jury convicted Abel Santiago of operating a continuing criminal enterprise, conspiracy

to distribute in excess of 1,000 kilograms of marijuana, conspiracy to distribute over five kilograms of

---

        [*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio,
sitting by designation.

cocaine, five counts of distribution of cocaine, and one count of distributing over 100 kilograms of marijuana. Abel Santiago was sentenced to 360 months' imprisonment.

Finally, the jury convicted Hilario Zuniga ("Zuniga") of conspiracy to distribute in excess of 1,000 kilograms of marijuana, conspiracy to distribute over five kilograms of cocaine, and distributing over 100 kilograms of marijuana. Zuniga received a sentence of 188 months' imprisonment.

Each of the three defendants now appeals his conviction. Rueben Santiago alleges prejudice as a result of a discovery violation by the government and ineffective assistance of counsel, while Abel Santiago and Zuniga allege that the evidence at trial was insufficient to establish certain facets of their convictions.

Because the government's discovery violation did not prejudice Rueben Santiago or otherwise infringe upon his right to a fair trial, and because sufficient evidence supported the convictions of Abel Santiago and Zuniga, we AFFIRM the jury's verdict and the district court's rulings. However, we remand all three cases to the district court for re-sentencing in accordance with *United States v. Booker*, 125 S.Ct. 738 (2005).

## I. Background

The trial and conviction of the three appellants stems from the breakup of an extensive organization dedicated to the sale of illegal drugs and headquartered at Harloff Farms, a several-hundred acre farm in Cocke County, Tennessee. In 2000, the FBI joined local law enforcement in investigating this organization. The FBI obtained a court-ordered Title III wire intercept, and used it to record hundreds of wire communications among co-conspirators. By means of these recordings, as well as persistent surveillance and the use of confidential informants within the organization, the FBI was able

to intercept shipments of cocaine *en route* from Atlanta, Georgia, to the farm, and to obtain warrants authorizing a search of the Harloff property.

On June 15, 2001, nineteen such warrants were executed at the farm and surrounding communities. FBI agents seized, among other things: $5,000, several guns, and a large quantity of jewelry from Abel Santiago's residence; $80,000 and several guns from Zuniga's residence; $36,000 from Zuniga's van; and 800 pounds of marijuana and $1,000 in cash from the basement of a brick house located within walking distance of the above residences.

On July 25, 2001, the three appellants were charged, along with twelve other individuals, in a multiple-count indictment for conspiracy to distribute, and for distribution of, marijuana and cocaine. The July indictment was superseded on September 25, 2001, by a 77-count indictment alleging similar criminal acts by the appellants and by thirteen other individuals. Each of these thirteen others pleaded guilty before a trial could be held.

On August 13, 2002, the appellants proceeded to trial. Evidence submitted by the government in support of its case included the aforementioned seizures (guns, drugs, money, and jewelry) as well as:

- Testimony from Manrique Reynoso ("Reynoso"), who ran a drug operation from a nearby farm, that every two to three weeks during 2000 he had supplied Abel Santiago with cocaine, and that on one occasion he had supplied him with 50 pounds of marijuana;

- Testimony by Reynoso that he used Jose Jaime Salazar ("Salazar") as a courier to deliver cocaine to Abel Santiago, and that he considered Salazar to be Abel Santiago's assistant;

- Testimony by Reynoso that he had also purchased 100 pounds of marijuana from Zuniga, and that Zuniga and Abel Santiago had delivered the marijuana to him;

- 3 -

- A tape-recorded conversation in which Salazar asks Reynoso for a kilogram of cocaine, and Reynoso agrees to send it to him, along with testimony by Reynoso that he had delivered the cocaine and received payment from Abel Santiago a few days later;

- Three additional tape-recorded conversations in which Reynoso and Abel Santiago discuss shipments of cocaine;

- Testimony by Jaime Benitez ("Benitez") that he received marijuana and cocaine from Reynoso, and sold ounce and kilogram quantities of cocaine to Abel Santiago, as well as a tape-recorded conversation in which Benitez and Abel Santiago discuss the price of a previous cocaine delivery;

- Testimony from Miguel Ramirez that he purchased drugs from both Reynoso and Abel Santiago, and that he had witnessed deliveries of drugs to Abel Santiago, including a van full of marijuana (later seized by agents and found to contain 860 pounds of the substance), by a man called "Luis";

- Statements from Mario Quintana that he had distributed drugs to Abel Santiago on Reynoso's behalf, and that he was present when Zuniga and Abel Santiago delivered 100 pounds of marijuana to Reynoso via pickup truck;

- Testimony from Christian Perez ("Perez"), Abel Santiago's girlfriend and co-habitant since February 2001, that she had sold cocaine for Abel, that she had seen large quantities of marijuana (7 to 10 kilos at a time) at the brick house known to be used as a storage facility by Zuniga, and that she had witnessed Salazar selling marijuana for both Zuniga and Abel Santiago;

- Three recorded conversations in which Perez and Abel Santiago discuss delivery of cocaine to customers;

- A tape-recorded conversation in which Abel Santiago's cousin Hilda asks for directions to his trailer-park residence, so that she can assist a buyer looking to pick up cocaine;

- A tape-recorded conversation in which Abel Santiago instructs Caesar Perez, Christian's brother, not to go through with a deal for a half-ounce of cocaine, because the buyer was not offering enough money;

- Testimony from Jose Pena Garcia that he had received marijuana from Zuniga and Zuniga's son, Oscar;

- Testimony from Charles Barnette ("Barnette"), a confidential informant instructed by agents to make purchases from various of the co-conspirators, that he had been introduced to Abel Santiago as "the main pin in the wheel" and that he had seen Abel acting in a supervisory role;

- Testimony from Barnette that he purchased an ounce of cocaine from Rueben Santiago on May 31, 2000, and more cocaine from an individual called "Frank" on July 26, 2001;

- *A tape-recorded conversation in which Barnette and Rueben Santiago discuss a future cocaine transaction, and Santiago mentions that he has just sold three kilos for $80,000;*

- Testimony from Charles Noe, that as a middleman in the drug business since 1998, he had negotiated deals in which drugs were purchased from each of the three defendant/appellants, and that over the course of two years he had personally bought drugs from each of the three, and made payments of at least $500,000 to Abel Santiago for cocaine and marijuana;

- Testimony from Earnest and Jeannie Marshall, who were originally cantaloupe pickers on the Harloff farm, but began (along with their son, Michael) delivering and selling drugs for the three appellants in 1999. Earnest Marshall testified to a number of individual transactions, and explained that in return for his services he received cocaine for his personal use;

- *Testimony from Crystal Marshall, daughter of Earnest and Jeannie, and Rueben Santiago's occasional girlfriend, that she had observed her brother Michael and Rueben Santiago selling two kilograms of cocaine and then 200 pounds of marijuana for Abel Santiago;*

- *Testimony from Crystal Marshall that she had received letters from Rueben Santiago threatening to harm her and her child if she testified against him or against Abel Santiago;*

- *Testimony from Crystal Marshall that Abel Santiago and Salazar controlled Rueben Santiago's activities by supplying him with crack cocaine to support his own habit;*

- *Testimony from Anthony Caldwell that he had purchased cocaine on a number of occasions from Salazar, as well as from each of the Santiagos;*

- *Testimony from Marla Taylor, an occasional guest of Rueben Santiago at the farm, that she had witnessed a delivery of 85 to 100 kilograms of cocaine to Abel Santiago, and a truckload of marijuana to Zuniga, as well as Abel Santiago giving instructions on distribution and collection to Salazar; and*

- *Testimony from Melinda Rodriguez, a neighbor and a former laborer on the farm, who observed Zuniga using the brick house to store marijuana.*

On August 20, 2002, the government concluded its case, and the district court granted motions to dismiss several of the substantive distribution counts as well as a felon-in-possession charge against Zuniga. The district court also denied a motion for a mistrial filed by Rueben Santiago, based upon the government's failure to make pretrial disclosure of one side of an audiotape. The tape in question contained the testimony summarized in italics above. Following the court's denial of the various motions, the jury issued the verdicts outlined above. These appeals followed.

## II. Trial Proceedings

Rueben Santiago argues that the district court erred in denying his motion for a mistrial, claiming that the failure to disclose the relevant portions of the Barnette recording unduly prejudiced him, and made it impossible for his counsel to effectively assist him. Abel Santiago argues that his conviction was not supported by sufficient evidence, but only in that the government failed to establish beyond a reasonable doubt that he "supervised" five other people. Zuniga asserts that his conviction was not supported by sufficient evidence, in that there was "no credible evidence" connecting him to the drugs seized in the brick house.

We will address each appellant's arguments individually.

### A. Reuben Santiago

Following Barnette's testimony and the playing of the tape in question before the jury, it became clear that the portion of the recording in which Reuben Santiago is heard to admit to selling cocaine had not been provided to Santiago's counsel. Apparently, the admission was on a tape containing recorded material on both sides – "A" and "B" – contrary to the usual FBI practice of using side "A" exclusively. The government copied only side "A" of each of more than 350 tapes in its possession for the purposes of disclosure to opposing counsel, and thus inadvertently omitted the key passage from the material given to Santiago's lawyer.

Santiago contends that this error resulted in a deprivation of his constitutional rights, and that he is entitled to a new trial to redress it. The district court declined to declare a mistrial, finding that allowing Santiago to recall and re-examine any witnesses that introduced or testified regarding the tape would be a sufficient curative measure. The court noted that the government's error was inadvertent,

and held that it had not prejudiced Santiago, because the government had previously informed him of its intention to introduce evidence that he had sold the three kilos of cocaine.

The panel reviews a district court's decision to deny a mistrial for abuse of discretion. *United States v. Trujillo*, 376 F.3d 593, 613 (6th Cir. 2004), citing *United States v. Yang*, 281 F.3d 534, 549 (6th Cir. 2002). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Id.*, citing *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). "Deference is given to the district court because the trial judge is in the best position to determine the nature of the alleged ... misconduct ... [and] is also in the best position to determine appropriate remedies for any demonstrated misconduct." *Id.*, citing *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995) (internal quotation marks omitted).

The district court did not abuse its discretion in denying a mistrial as a remedy for the government's inadvertent nondisclosure. As the court indicated, Santiago was alerted to the government's intent to introduce evidence regarding the sale of the three kilos in question. Even without the tape, Barnette could have testified to as much. Moreover, the evidence regarding Santiago's sale of three kilos was not introduced in support of any substantive charge of distribution. The jury could easily have found him guilty of the conspiracy charges without even considering the recorded conversation or the three-kilo transaction.

In finding that the error was not substantially prejudicial to Santiago, the court relied on "a determination of the fairness to the accused" as its "primary concern." *United States v. Atisha*, 804 F.2d 920, 926-27 (6th Cir. 1986). With this in mind, allowing Santiago to recall and to question witnesses involved with the recording was a remedy well within the court's discretion.

Santiago's counsel contends that the surprise engendered by playing the tape hindered his performance at trial, and that the non-disclosure prevented him from rendering effective counsel to his client before trial. Neither of these arguments justifies reversal. Surprising moments and unexpected statements made from the witness stand are par for the course in any trial, and even more so in a relatively lengthy criminal proceeding. Counsel cannot claim a violation of his client's rights under *Strickland v. Washington*, 466 U.S. 668 (1984), merely because the revelation of the tape's content caught him off guard. Given the cumulative nature of the evidence (again, Barnette could have testified about the three kilos from personal knowledge), counsel cannot plausibly claim that he was wholly unprepared for what he heard.

Finally, counsel's claim that he would have advised a guilty plea had he been given the recording is at best mere speculation. Without a finding of bad faith on the part of the government, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id*. at 689, and find that Reuben Santiago has not shown that the tape "caused [him] to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc).

**B. Abel Santiago**

Abel Santiago alleges that the evidence presented by the government was insufficient to support a finding that he organized, supervised, or managed five or more people as required to convict him of engaging in a continuing criminal enterprise under 21 U.S.C. §848(c). *See United States v. Elder*, 90 F.3d 1110, 1122-23 (6th Cir. 1996).

> It is well established that an organizer is not necessarily able to control those whom he or she organizes. Rather, an organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise.

*United States v. Patrick*, 965 F.2d 1390, 1397 (6th Cir. 1992) (citations omitted). Santiago concedes in his brief that among the indicia of a narcotics operation organizer are the tendency to set prices for drugs, dictate terms of payment, approve customers, store drugs at another's property, supervise brokers or couriers, and direct persons that collect or launder proceeds. *United States v. Ward*, 37 F.3d 243, 247 (6th Cir. 1994); *United States v. Chalkias*, 971 F.2d 1206, 1214 (6th Cir. 1992). A management relationship requires more than mere interaction as buyer and seller. *Ward*, 37 F.3d at 248.

Moreover, this Court's mandate to "review ... the sufficiency of the evidence is quite limited." We must view "the evidence in the light most favorable to the government and will affirm the jury's verdict unless no rational trier of fact could have found, beyond a reasonable doubt," that the defendant committed the offense charged. *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc). "[E]very reasonable inference from the evidence must be drawn in the government's favor," *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989), citing *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988), and the Court must "refrain from independently judging the weight of the evidence." *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001), *cert. denied*, 535 U.S. 991 (2002).

Applying these principles, it is clear that a reasonable jury could have found that Abel Santiago organized, supervised, or managed at least five people as required by the statute. Santiago concedes that he supervised the drug-selling activities of his brother Rueben, as well as those of Christian Perez and her brother Caesar. The jury also heard evidence that a number of persons dealt with Jose Salazar as Abel Santiago's assistant[1], that both Ernest and Jeannie Marshall sold drugs for Santiago in exchange

---

[1] As the government observes, Salazar's status was confirmed by the testimony of Manrique Reynoso, Christian Perez, Marla Taylor, and Anthony Caldwell. To find that Santiago supervised Salazar, the jury needed to believe only one of these individuals.

for cocaine for their personal use, that Abel's cousin Hilda had asked him for directions on behalf of a man seeking to buy cocaine, and that a man named "Luis" had brought a van containing 860 pounds of marijuana to Santiago for safekeeping. The jury needed only to believe the testimony concerning two of these five individuals in order to support their finding that Abel Santiago supervised five persons. Drawing all inferences in the government's favor, we conclude that a reasonable jury could easily have done so.

Santiago seeks to analogize his case to others in which delivery men, sellers, or those merely "providing inventory" to others were held not to have acted in a supervisory capacity. Those are not the facts in this case. Here, the vast majority of the testimony depicted Abel Santiago as the lynchpin of the Harloff Farms drug operation. Abel Santiago was repeatedly depicted as the organizer and manager of cocaine and marijuana transactions, and the evidence showed at least seven individuals receiving instructions from him. Again, the panel must construe all inferences in the government's favor, and the jury needed only to find the participation of 2 of the 5 individuals whose actions are disputed by Santiago.

Santiago devotes considerable space in his brief to identifying vagueness and inconsistencies in the testimony describing "Luis." Again, though, the jury need not have believed that "Luis" participated in the conspiracy, or even that he existed, to legitimately find Santiago guilty beyond a reasonable doubt. In fact, some members of the jury may have found "Luis" to have been a participant, while others did not. "In deciding whether a defendant had a managerial relationship with five or more persons, the jury is not required to agree unanimously on the identities of the five individuals." *United States v. Fredell*, 79 Fed. Appx. 799, 805 (6th Cir. Oct. 28, 2003), citing *United States v. English*, 925 F.2d 154, 157 (6th Cir. 1991).

In sum, the evidence presented at trial was far from insufficient to demonstrate that Abel Santiago supervised the requisite number of persons. Exercising the proper deference, and construing all facts and inferences in the government's favor, we affirm his conviction.

**C. Hilario Zuniga**

Zuniga also challenges the sufficiency of the evidence supporting his conviction. In his appeal, the government is entitled to the presumptions regarding jury deliberations and the credibility of witnesses outlined above. Zuniga's extremely brief argument – in which he cites only one case, *Jackson v. Virginia*, 443 U.S. 307 (1979)(accused constitutionally protected against conviction except upon evidence establishing every element of the crime beyond a reasonable doubt) – does no more than imply that some of the government's evidence was imperfect, and that some of its witnesses were less than credible.

As noted above, the government introduced a wealth of evidence indicating Zuniga's involvement in the Harloff Farms drug operation, including testimony by Marla Taylor, Melinda Rodriguez, and the FBI agents who seized more than $100,000 in cash from Zuniga's trailer and his van. Zuniga's argument of insufficiency must therefore fail on grounds similar to Abel Santiago's.

Moreover, the Court need not consider an argument as to which an appellant has not developed supporting analysis. *See Hutchison v. Bell*, 303 F.3d 720, 748 n.7 (6th Cir. 2002)(claims inadequately briefed are deemed waived), *cert. denied*, 539 U.S. 944 (2003); *United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999)(issues presented in "perfunctory manner, unaccompanied by some effort at developed argumentation" are deemed waived), *cert. denied*, 529 U.S. 1029 (2000); *United States v. Watkins*, 179 F.3d 489, 500-01 (6th Cir. 1999)(appellant has "duty to point to the parts of the record that support his position and also to present arguments in sufficient detail to show how they support his

position"). Zuniga has given us no more than the blanket assertion that "no credible evidence was presented or in the record as to the guilt of this defendant;" as such, his claim is denied.

For the foregoing reasons, the convictions of the three appellants are affirmed.

### III. Sentencing Issues

Although none of the three appellants raised a challenge to his sentence in district court, we may reverse the sentences imposed on a showing of plain error committed by the district court. *See, e.g.*, *United States v. Oliver*, 397 F.3d 369, 377-78 (6th Cir. 2005); *United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir. 1997), *cert. denied*, 522 U.S. 925 (1997); FED. R. CRIM. P. 52(b).

On June 24, 2004, while each of these cases were on appeal, the Supreme Court issued its opinion in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), which held that a court violates a defendant's Sixth Amendment rights whenever it imposes a sentence that is not based solely on "facts reflected in the jury verdict or admitted by the defendant." *Id.* at 2537. On January 12, 2005, while a decision on these cases was still pending, the Supreme Court issued its opinion in *Booker*, which extended *Blakely*'s Sixth Amendment holding to the federal Sentencing Guidelines and was deemed applicable to all cases then on direct review. 125 S.Ct. at 769.

Since *Booker*, this Court has frequently applied plain error review to find Sixth Amendment violations and remand for re-sentencing. *See, e.g., Oliver*, 397 F.3d at 369; *United States v. Alva*, 2005 U.S. App. LEXIS 7431; 2005 FED App. 0197P (6th Cir. 2005); *United States v. McDaniel,* 398 F.3d 540, 547-50 (6th Cir. 2005). In fact, "even absent a Sixth Amendment violation, this Court has decided that a defendant sentenced under the mandatory Guidelines regime is entitled to a remand for resentencing under the now-advisory Guidelines unless there is evidence in the record to rebut the presumption of prejudice." *Alva*, 2005 U.S. App. LEXIS 7431, at *4-*5, citing *United States v. Barnett*,

398 F.3d 516, 525-27 (6th Cir. 2005). *See also United States v. Sanders*, 404 F.3d 980; 2005 U.S. App. LEXIS 6704, at *18 (6th Cir. 2005) (district court committed "what we now know to be plain error" by applying Guidelines as mandatory rather than advisory).

Because the district court improperly found facts in sentencing the appellants, we must remand all three for re-sentencing. Reuben Santiago received a sentence of 210 months, based at least in part on an enhancement for obstruction of justice. Abel Santiago received a sentence of 360 months, based at least in part on an enhancement for possession of a firearm. Zuniga received a sentence of 188 months, based at least in part on enhancements for both firearm possession and obstruction of justice. Each appellant was found guilty of distribution and conspiracy offenses which do not include obstruction or firearm possession as constituent elements. Thus, the enhancements for possession and obstruction were made on the basis of judge-found facts and in contravention of *Booker*, and remand is appropriate in all three cases.

## IV. Conclusion

For the foregoing reasons, the convictions of Abel Santiago, Reuben Santiago, and Hilario Zuniga are AFFIRMED. All three sentences are VACATED and the cases REMANDED for re-sentencing.